Filed 4/21/22  BFCAP Investments v. Lifehouse Parkview Properties CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BFCAP INVESTMENTS, LLC, | B307388 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC128812) |
| v. | |
| LIFEHOUSE PARKVIEW PROPERTIES, LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Young, Judge.  Reversed.

Polsinelli, Jonathon E. Cohn for Plaintiff and Appellant.

Shumener, Odson & Oh, Betty M. Shumener, Benjamin L. Hicks for Defendants and Respondents.

This is the second appeal by plaintiff BFCAP Investments, LLC (BFCAP) arising out of a contractual dispute over the sale of a nursing facility. We previously affirmed the trial court's grant of summary judgment in favor of the sellers, defendants and respondents Lifehouse Parkview Properties, LLC (PropCo) and Lifehouse Parkview Operations, LLC (OpCo).

On remand, the trial court granted defendants' motion for attorney fees, finding that defendants were the prevailing parties and therefore entitled to attorney fees and costs pursuant to the applicable contract. BFCAP appeals that fee award. It argues that the trial court erred in finding the contractual fee provision applied to the litigation here. We agree and therefore reverse the trial court's order granting defendants' motion.

## FACTUAL AND PROCEDURAL HISTORY

### *Underlying Case*

#### A. *The Transaction*

We recite the factual background here largely based on our prior unpublished opinion, *BFCAP Investments v. Lifehouse Parkview Properties* (Feb. 2, 2021, No. B303550) (nonpub. opn.). PropCo leased the "land, improvements, and certain personal property" relating to a skilled nursing facility in Bakersfield, California (the facility). OpCo subleased, operated, and held the license for the facility. Plaintiffs Kingston Healthcare Center, LLC (Kingston) and BFCAP entered into a series of three agreements with defendants in which BFCAP would purchase PropCo's lease of the property, and Kingston would acquire OpCo's facility license. The underlying dispute centered around which party was liable for the payment of quality assurance fees (QAFs), state-imposed licensing fees on skilled nursing facilities, that accrued before the sale.

On January 14, 2016, defendants and BFCAP entered into the Purchase and Sale Agreement (PSA) to sell PropCo's leasehold interests to BFCAP. Under the PSA, BFCAP agreed to purchase the "Acquired Assets" from defendants and to assume the "Assumed Liabilities." The PSA defined "Acquired Assets" to include PropCo's rights as a tenant under the lease of the property; defendants' right, title, and interest in defined tangible personal property (such as equipment and furnishings at the facility) and intangible property (such as goodwill); permits, inventory, supplies, and

2

records related to the facility; and certain patient deposits. The PSA defined "Assumed Liabilities" to include liabilities of the facility after the closing date, as well as accrued QAFs up to a specified amount.[1]

The relevant attorney fee provision of the PSA, section 16.1.1(c)(ii), was contained in Article 16, "Remedies," under section 16.1, "Pre-Closing Defaults," and subsection 16.1.1, "Buyer's Default." Section 16.1.1(a) contained a liquidated damages provision, providing that if BFCAP failed to complete the acquisition, defendants could terminate the agreement and retain the deposit plus interest, thereby waiving all other claims. Under section 16.1.1(b), in the event defendants terminated the agreement under section 16.1.1(a), defendants had the right to immediately market, sell, and convey the Acquired Assets.

Section 16.1.1(c) set forth "exceptions to the limitations on [defendants'] damages under Section 16.1.1(a)." One such provision, section 16.1.1(c)(ii), provided: "In the event that Buyer [BFCAP] initiates a Judicial Reference or brings an action or cross-action against Sellers [defendants] for an alleged breach or default by Sellers of their obligations under this Agreement and, in connection with that Judicial Reference, action or cross-action, Buyer records a lis pendens or otherwise attempts to enjoin, attach or restrict Sellers' ability to sell or transfer the Acquired Assets or any portion thereof (the "Buyer's Action"), Sellers shall not be restricted by the provisions of Section 16.1.1(a) from seeking (i) to expunge that lis pendens, injunction or other restraint, or (ii) other relief with respect to Buyer's Action. If Sellers are the prevailing party in Buyer's Action, Sellers shall be entitled to recover monetary damages, costs and expenses (including, without limitation, attorneys' fees and interest awarded to Sellers in Buyer's Action) which Sellers may suffer or incur as a result of Buyer's Action. . . ."

Also on January 14, 2016, OpCo and Kingston entered into the Management and Operations Transfer Agreement (MOTA), which addressed transferring operations of the facility from OpCo to Kingston. Under the

---

[1] Consistent with this term, the PSA provided elsewhere that plaintiffs would be liable for accrued QAFs up to a specified amount and defendants would be responsible for paying any sums over that amount.

MOTA, Kingston "jointly and severally with [BFCAP] assumes and agrees to pay" the accrued QAFs up to the specified amount, as "defined in the PSA."

According to plaintiffs, after the parties signed the PSA and MOTA, the non-party "landlords refused to accept the structure as agreed upon in the PSA whereby Plaintiffs would be responsible for the previously accrued QAFs in exchange for a lower purchase price." Thus, on March 22, 2016, defendants and BFCAP signed an "Amendment to Purchase and Sale Agreement" (Amendment). The Amendment stated, in part, that the parties "agree that Quality Assurance Fees accrued prior to the Closing Date shall remain the responsibility of [defendants], [BFCAP] shall receive no credit against the Purchase Price for Quality Assurance Fees, and no Quality Assurance Fees accrued prior to the Closing Date shall be among the Assumed Liabilities." The purchase price was raised to $3.3 million. The MOTA was not similarly amended.

The transaction was completed on August 31, 2016. According to plaintiffs, "[O]nce Kingston assumed operations of the Facility, DHCS[2] initiated a withhold of Kingston's revenue in the amount of $517,000 for QAFs attributable to the years 2005-2008 and 2014-2015."

**B.** *Complaint and Application for Attachment*

Plaintiffs sued defendants on February 8, 2018. In their third amended complaint, the operative pleading for purposes of this appeal, plaintiffs asserted five causes of action. The only cause of action relevant to the appeal is the second cause of action, "breach of contract under PSA," asserted by both BFCAP and Kingston; the other four causes of action were asserted by Kingston alone.[3] In this cause of action, plaintiffs alleged that defendants breached the amended PSA by failing to pay the QAFs and failing to indemnify BFCAP.

_____

[2] DHCS, the California Department of Health Care Services, is responsible for the assessment and collection of QAFs on skilled nursing facilities. (See Health & Saf. Code, § 1324.21.)

[3] In the original complaint, BFCAP also asserted claims for declaratory relief, unjust enrichment, indemnity, and breach of the implied covenant of good faith and fair dealing against defendants. Those claims were dismissed after the court sustained in part several rounds of demurrers filed by defendants.

4

On March 2, 2018, plaintiffs filed an application seeking a right to attach order and a writ of attachment pursuant to Code of Civil Procedure, section 483.010. On the form application, plaintiffs sought to secure by attachment $526,184.81 in damages, including over $8,000 in estimated allowable attorney fees. Plaintiffs also checked the box identifying "the following property sought to be attached for which a method of levy is provided is subject to attachment: Any property of a defendant who is not a natural person." In the accompanying memorandum, plaintiffs cited their complaint and stated that they were seeking the attachment to "secure their recovery in this case."

Defendants opposed the application for writ of attachment. They argued that plaintiffs could not meet the standard for attachment because they could not demonstrate their claims had probable validity, as there was no evidence that plaintiffs paid any QAFs and the operative documents showed that Kingston was liable for them in any event. Defendants also objected to plaintiffs' evidence.

The court denied the application in October 2018. The court found that much of plaintiffs' evidence was inadmissible and that plaintiffs had not established a probability of success, given the contractual conflict between the MOTA (under which Kingston agreed to pay the QAFs) and the amended PSA (under which defendants were liable for the QAFs).

C. *Summary Judgment and First Appeal*

Defendants moved for summary judgment, asserting in part that Kingston—not BFCAP—paid the outstanding QAFs, so BFCAP could not prove it suffered any damages on its breach of contract claim. In their opposition, plaintiffs argued that because defendants failed to pay the outstanding QAFs, the state had recouped those amounts from Kingston's revenue. BFCAP argued that it was damaged based on an indemnity agreement created after defendants' motion for summary judgment was filed, which stated that BFCAP agreed to indemnify Kingston for any losses associated with the QAFs or the litigation.

The trial court granted the motion and entered summary judgment for defendants on BFCAP's breach of contract claim. BFCAP appealed. In our prior opinion, we affirmed the judgment in favor of defendants. We noted

5

BFCAP's admission that it "had not yet paid any damages related to the QAF issue, and the only recoupment had come out of Kingston's revenue stream, not BFCAP's." In addition, we rejected BFCAP's reliance on the indemnity agreement, finding that BFCAP could not rely on a "new obligation" outside of the pleadings to defeat summary judgment.

***Motion for Attorney Fees***

### A. *First Motion and Opposition*

On January 10, 2020, defendants filed their motion for attorney fees, seeking approximately $320,000 in attorney fees and costs. Defendants asserted that they were entitled to attorney fees pursuant to section 16.1.1(c)(ii) of the PSA, which they characterized as a "broad attorneys' fees provision." In support of this assertion, defendants repeatedly quoted the following portion of section 16.1.1(c)(ii):

> "In the event that Buyer initiates a Judicial Reference or brings an action or cross-action against Sellers for an alleged breach or default by Sellers of their obligations under this Agreement . . .
>
> If Sellers are the prevailing party in Buyer's Action, Sellers shall be entitled to recover monetary damages, costs and expenses (including, without limitation, attorneys' fees and interest awarded to Sellers in Buyer's Action) which Sellers may suffer or incur as a result of Buyer's Action, and the amount of any such monetary damages, attorneys' fees, and such costs and expenses that are awarded to Sellers in Buyer's Action shall be in addition to the Liquidated Damage Amount set forth in Section 16.1.1(a)."

The full provision reads as follows, with the portion omitted by defendants noted in italics:

> "In the event that Buyer initiates a Judicial Reference or brings an action or cross-action against Sellers for an alleged breach or default by Sellers of their obligations under this Agreement, *and, in connection with that Judicial Reference, action or cross-action, Buyer records a lis pendens or otherwise attempts to enjoin, attach or restrict Sellers' ability to sell or transfer the Acquired Assets or any portion thereof (the "Buyer's Action"), Sellers shall not be restricted by the provisions of* <u>*Section 16.1.1(a)*</u> *from seeking (i) to expunge that lis pendens, injunction*

6

*or other restraint, or (ii) other relief with respect to Buyer's Action.* If Sellers are the prevailing party in Buyer's Action, Sellers shall be entitled to recover monetary damages, costs and expenses (including, without limitation, attorneys' fees and interest awarded to Sellers in Buyer's Action) which Sellers may suffer or incur as a result of Buyer's Action. . . ."

Relying on their citations to section 16.1.1(c)(ii), defendants argued that the "broad" attorney fee clause therein "requires BFCAP to pay costs and attorney's fees in *any action* brought by BFCAP against 'Sellers' in which 'Sellers' ultimately prevail." As such, defendants contended that "[b]ecause BFCAP's claim was premised on the PSA and Amendment, BFCAP's claim falls within the attorneys' fee clause." Defendants attached a complete copy of the PSA, as well as copies of the MOTA and the Amendment, as exhibits to their motion.

On April 24, 2020, BFCAP filed an opposition to the motion for attorney fees. BFCAP argued that defendants had materially misrepresented that the attorney fee provision in the PSA was "broad" and that defendants "intentionally" deleted "a material phrase, which completely changes the meaning of Section 16.1.1(c)(ii)." Specifically, BFCAP argued that the omitted contractual language set forth one of the conditions required to meet the definition of a "Buyer's Action" and thereby allow an attorney fee award for the defense of such an action. In this case, BFCAP asserted that it had "not ever 'recorded a lis pendens or otherwise attempted to enjoin, restrict, or attach' Defendants' ability to dispose of its Acquired Assets," and therefore, that section 16.1.1(c)(ii) "does not apply." BFCAP contended that it could not have attempted to restrict defendants' ability to sell or transfer the Acquired Assets in 2018 because defendants no longer owned those assets—the parties completed their transaction in 2016, at which point plaintiffs "took over ownership and operation of the skilled nursing facility and all of the assets to which it was entitled under the agreements." Moreover, BFCAP noted that defendants had not shown that plaintiffs initiated a "Buyer's Action," as defendants did not address the omitted provision in their motion for attorney

7

fees.[4] BFCAP gave notice to defendants that it would file a motion for sanctions if defendants did not withdraw or adequately amend their motion for attorney fees.

## B.     *Second Motion, Opposition, and Motion for Sanctions*

On May 7, 2020, defendants filed a "notice of errata and correction" to their motion for attorney fees. In the notice of errata, they stated that they "inadvertently omitted a portion of the contract provision at issue from the body" of their motion, but had "no intent to mislead the parties or the Court." Defendants also asserted that their "corrected" motion included "an explanation of the law and context that led to the errata," which was necessary because defendants "did not know that BFCAP contested the applicability of the attorneys' fees provisions in this case, as BFCAP itself sought attorneys' fees under the same provision in its Third Amended Complaint."

In their second motion,[5] defendants deleted their characterization of the PSA's attorney fee provision as "broad" and quoted the provision in full. They also included a different attorney fee provision from the MOTA. Defendants argued that BFCAP was "estopped from denying that the fees provisions apply," because BFCAP had asserted a right to recover attorney fees in its cause of action for breach of the PSA.

In addition, defendants argued that "the PSA and MOTA contain attorneys' fees provisions that entitle Defendants to recover fees and costs." Defendants asserted in a single sentence that this litigation constituted a "Buyer's Action" under the PSA, arguing that "BFCAP did attempt to attach all of Defendants' property in this action and was denied, placing this action

---

[4]     BFCAP also asserted that any attorney fees should be apportioned between the various claims and that the fees defendants requested were unreasonable. These arguments are outside the scope of this appeal.

[5]     As we discuss further *post*, we agree with BFCAP and the trial court that defendants' purportedly "corrected" motion went far beyond including the complete text of section 16.1.1(c)(ii) and any necessary contextual background. We therefore refer to this motion herein as defendants' second motion.

within the definition. . . .["6] Defendants also argued that the PSA and the MOTA should be "read together," and that, as a result, "the limitation in the definition of 'Buyer's Action' under the PSA was not to bar rightfully owed attorneys' fees under the PSA and MOTA, but to allow Defendants the right to obtain damages in excess of the liquidated damages under the PSA and MOTA."

BFCAP filed an objection to defendants' second motion and requested leave to file a sur-reply. It argued that defendants had "far surpassed" correction of the issues identified in the original motion, including "adding a completely new argument alleging that they are also entitled to attorneys' fees under a separate agreement," the MOTA. In the sur-reply, BFCAP contended that in the second motion, defendants "more or less abandon their original argument to entitlement to attorneys' fees under the PSA," instead "offering a completely new theory of recovery." BFCAP urged the court to ignore defendants' new reliance on the MOTA, and further argued that the provision in the MOTA did not apply because BFCAP was not a party to that agreement. BFCAP also asserted that defendants' estoppel argument failed, as BFCAP had never "specifically alleged or disputed the existence of an attorneys' fees provision in either the MOTA or the PSA," but instead "disputes the applicability to the facts of this case."

BFCAP also filed a motion for sanctions.[7] BFCAP argued that defendants' claim to fees under the PSA was frivolous because defendants ignored "the defined terms of 'Buyer's Action' and 'Acquired Assets.'" BFCAP again argued that its application for attachment in 2018 "could not possibly have restricted Defendants' 'ability to sell or transfer the Acquired Assets' because the Acquired Assets—a clearly defined term in the PSA—had already been sold and transferred to BFCAP in 2016 when the transaction closed."

---

[6]     In support of this contention, defendants cited to the court's ruling denying the plaintiffs' application for attachment, which found that the application "seeks to attach the property of Defendants."

[7]     It appears from the record that BFCAP served, but never filed, its original motion for sanctions in response to defendants' original motion for fees. After defendants filed their second motion for fees, BFCAP amended its motion and filed it as a "second" motion for sanctions.

Defendants filed a response to BFCAP's objection and sur-reply on June 18, 2020. They also filed a reply on the same day. Defendants asserted that all the arguments in their second motion were proper as they "could have been validly raised by way of a reply brief . . . as there was no new evidence." In a footnote, defendants argued that "[w]hile BFCAP claims that it was not actually seeking to attach the property described in the attorneys' fees provision, thereby removing this action from the definition, that is not material," and again asserted that the language should be "read in connection with the MOTA."

C.  *Hearing and Ruling*

The trial court issued a tentative ruling in advance of the hearing on the two attorney fees motions, finding that defendants' second motion "contains more than just corrections." As a result, the court's tentative ruling found that defendants' second motion was "an entirely new motion for attorney's fees" and denied the motion as untimely, as it was filed after the deadline to move for attorney fees.

At the hearing on June 25, 2020, defendants' counsel asserted that defendants had not intended to mislead the court, noting that the full text of the PSA was provided as an exhibit to the original motion. The court acknowledged the existence of the exhibit, but stated that "[m]isleading maybe would be an understatement as to how it was presented to the court." Defendants also argued that BFCAP had relied on the PSA's attorney fee provision "throughout this case" and that defendants' reliance on the MOTA fee provision in their second motion was proper because that contract was "incorporated into the PSA." The court disagreed, stating that defendants' reliance on the MOTA was a new argument raised in their second motion. In response, defendants stated that, to the extent the court found arguments were not properly raised in the original motion, the court should disregard them and "simply rely on the arguments that are properly raised in the original motion and in the reply brief." Defendants also contended that they properly raised estoppel in the reply, in response to BFCAP's contention in its opposition that the PSA did not allow for attorney fees.

Turning to BFCAP's counsel, the court indicated that it was inclined "to go back and . . . limit my analysis to the original grounds. . . . Is there

10

anything that you would like to add?" BFCAP's counsel responded that defendants had added entirely new arguments to their second motion and were no longer focused on the fee provision in the PSA. BFCAP's counsel also noted that he was "prepared today on the second motion, not on the first motion," and that it would be "problematic" for the court to "simply . . . go back and look at the first motion." The court agreed that defendants "went far beyond correcting that initial motion," but expressed concern that defendants' initial motion was timely and there were "grounds set forth in the initial motion that maybe the court should have made a substantive ruling on as opposed to just rejecting everything because it's untimely." BFCAP urged the court to find, as it did in its tentative ruling, that "the second motion is the operative motion . . . and that was not timely filed." At the conclusion of the hearing, the court took the matter under submission.

The court issued a final ruling on July 9, 2020. The court found that "Defendants' 'corrected' motion contains more than just corrections," and therefore was "an entirely new motion for attorneys' fees." Moreover, the court found that the second motion was untimely and defendants "failed to present this Court with good cause with respect to the new arguments," including "arguments as to the MOTA and estoppel that were not in Defendants' original motion." The court rejected defendants' suggestion that these arguments were provided as "context for their failure to include" the full contractual language in their original motion. The court therefore disregarded the second motion and instead analyzed "the original timely motion."

The court also rejected defendants' argument that BFCAP was estopped from asserting that the attorney fees provision in the PSA did not apply. The court reasoned that defendants' estoppel argument was inapplicable, as BFCAP never "argued that the attorney's fees provision in the PSA was not an attorney's fees provision." Instead, BFCAP contended that the condition precedent under the contract had not been met. As this argument was not inconsistent with any prior position taken by BFCAP, estoppel did not apply.

Turning to the application of the attorney fee provision in the PSA, the court quoted section 16.1.1(c)(ii) in full and agreed with BFCAP that the

11

"attorney's fees clause in the PSA contains a condition precedent." However, the court concluded that the requisite condition had been met. The court noted defendants' argument in reply that BFCAP attempted to attach "all of Defendants['] property," relying on the 2018 order denying plaintiffs' application for a writ of attachment. The court found that defendants "have shown that they are entitled to attorney's fees under the contract and that one of the condition precedents occurred—Plaintiffs attempted and failed to attach Defendants' assets." The court did not reference "Acquired Assets" as defined in the PSA or otherwise explain how that term included the assets plaintiffs sought to attach in 2018.

The court also concluded that defendants did not need to apportion costs by plaintiff and that the attorney fees claimed were reasonable. The court thus granted the motion and awarded defendants $320,609.27 in attorney fees and costs.

BFCAP timely appealed.

## DISCUSSION

BFCAP contends the trial court erred in granting defendants' motion for attorney fees based on an erroneous interpretation of the PSA's fee provision. We agree.

## I.  *Legal Standards*

"Each party to a lawsuit must pay his or her own attorney fees except where a statute or contract provides otherwise." (*Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966 (*Cargill*).) Attorney fees authorized by contract are recoverable as costs by the party prevailing in the action. (Code Civ. Proc., §§ 1032, subd. (b), 1033.5, subd. (a)(10)(A); see also *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 (*Scott*).) Thus, in analyzing a request for contractual attorney fees, the court must "'determine whether the parties entered an agreement for the payment of attorney fees, and if so, the scope of the attorney fee agreement.' [Citation.] This determination requires us to apply traditional rules of contract interpretation." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752 (*Mountain Air*), citing *Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.)

On appeal, "a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo." (*Mountain Air, supra,* 3 Cal.5th

at p. 751; see also *Cullen v. Corwin* (2012) 206 Cal.App.4th 1074, 1078; *Cargill, supra*, 201 Cal.App.4th at p. 966.)  Here, whether the PSA provides for a fee award is a question of contract interpretation.  We interpret a contract de novo if the interpretation does not turn on the credibility of extrinsic evidence.  (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238; *Kalai v. Gray* (2003) 109 Cal.App.4th 768, 777.)  However, to the extent the trial court resolved a disputed factual issue, we determine whether there is substantial evidence to support the court's findings.  (*Cullen v. Corwin, supra*, 206 Cal.App.4th at p. 1078; *Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378.)

## II.    *Analysis*

BFCAP contends that defendants are not entitled to attorney fees pursuant to the PSA section 16.1.1(c)(ii) because it did not attempt to attach any Acquired Assets as part of this litigation.  As a result, no Buyer's Action occurred as defined by the PSA and the condition precedent to an award of attorney fees was never met.

### A.    *Forfeiture*

As an initial matter, we reject defendants' belated attempts to bolster their attorney fee request by citing additional contractual provisions.  In their original motion for attorney fees, defendants argued only that they had a contractual right to fees pursuant to their partial citation of section 16.1.1(c)(ii) of the PSA.  They neither cited to nor relied on any other contractual provisions.  In their second motion, defendants added a claim that they were entitled to attorney fees under the MOTA.  They reassert this claim in their respondent's brief on appeal, arguing that the MOTA "contains a clear and unambiguous prevailing party attorneys' fees provision with no condition precedent."  In addition, defendants' appellate brief cites to a third provision that references attorney fees, PSA section 16.1.1(c)(i).  But defendants did not rely on either of these provisions in their original motion for fees; instead, they exclusively relied on section 16.1.1(c)(ii).  The trial court accordingly found that defendants failed to timely raise any arguments regarding the MOTA.

Indeed, defendants do not challenge the trial court's decision to reject their second motion as untimely.  Moreover, they fail to directly address the

trial court's finding that their arguments regarding the MOTA were not properly raised in their original motion. Instead, in a footnote, defendants contend that any argument by BFCAP that they "did not seek attorneys' fees pursuant to the MOTA in their motion" would not be "accurate." Defendants then claim that while their "initial moving papers focused on the PSA, [defendants] attached the MOTA to their motion as evidence and properly raised the MOTA on Reply."

Defendants have forfeited the argument that they are entitled to attorney fees under any contractual provision other than section 16.1.1(c)(ii) of the PSA. Defendants did not rely on the MOTA as a basis for their attorney fee request, and their inclusion of the MOTA as an exhibit to their initial motion does not preserve their argument. Similarly, raising the right to fees under an entirely different provision of a separate contract (the MOTA) for the first time in their reply brief does not expand defendants' previously made argument. Instead, defendants have asserted a new argument. (See *American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275-276 ["An issue is new if it does more than elaborate on issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief."].) The trial court did not abuse its discretion by refusing to consider new arguments made for the first time in defendants' reply brief. (See *Grappo v. McMills* (2017) 11 Cal.App.5th 996, 1009 [finding that trial court has discretion whether to "accept arguments or evidence made for the first time in reply"]; *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 241 [same]; *California Retail Portfolio Fund GMBH & Co. KG v. Hopkins Real Estate Group* (2011) 193 Cal.App.4th 849, 861 [concluding trial court did not abuse its discretion by considering reply evidence].) We also decline to consider defendants' reliance on other attorney fee provisions in the PSA, as defendants failed to raise them before the trial court. (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 ["'[W]e ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived.'"].)

14

**B.    *Estoppel***

Defendants contend that BFCAP is judicially estopped from challenging the right to attorney fees under section 16.1.1(c)(ii) because in the complaints, BFCAP alleged a right to attorney fees as part of its breach of contract claim.  We agree with the trial court's conclusion that estoppel did not apply.

"'Judicial estoppel is an equitable doctrine aimed at preventing fraud on the courts.'" (*M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456, 463 (*M. Perez*), quoting *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850.)  "It prohibits a party from taking inconsistent positions in the same or different judicial proceedings." (*M. Perez, supra*, 111 Cal.App.4th at p. 463, citing *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.)  Generally, judicial estoppel applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud or mistake." (*Jackson v. County of Los Angeles, supra*, 60 Cal.App.4th at p. 183.)

In support of its contention, defendants rely on *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175 (*International Billing*).  We agree with the trial court that this case is inapplicable here.  In *International Billing*, the plaintiff employer sued several former employees alleging claims including misappropriation of trade secrets and breach of confidentiality agreements.  The plaintiff's complaint included a request for attorney fees; in subsequent briefing, the plaintiff quoted the contractual provision under which it claimed to be entitled to fees.  (*Id.* at pp. 1179-1180.)  The defendants prevailed at trial and moved for an award of fees.  (*Id.* at p. 1180.)  The plaintiff opposed, arguing that the contractual provision was not a fees provision.  (*Id.* at p. 1182.)  The trial court granted the motion for fees and the appellate court affirmed, finding that the provision provided an award of attorney fees to the prevailing party.  (*Id.* at p. 1186.)  In dicta, the court also found that the plaintiff was judicially "estopped from denying that

15

the contract contains an attorney fees clause. The prayer in the first amended complaint sought the payment of fees. Although the language of the prayer was not specific . . . the plaintiff attached the contract to its complaint and in its concluding trial brief it clearly and unambiguously requested an award of fees based on language" in the confidentiality agreement. (*Ibid.*; see also *M. Perez, supra,* 111 Cal.App.4th at p. 464 [discussing the "dicta" in *International Billing*].)

The same court that decided *International Billing* called the rule into question a few years later. In *M. Perez, supra*, 111 Cal.App.4th at pp. 465, 469, the court determined that the rule announced in *International Billing* "sweeps too broadly" and had not "made proper use of the [judicial estoppel] doctrine." Instead, the court concluded that the "correct rule" "requires a party claiming attorney fees to establish that the opposing party actually would have been entitled to receive them if the opposing party had prevailed. The mere allegation in a complaint that the plaintiff is entitled to receive attorney fees does not provide a sufficient basis for awarding them to the opposing party if the plaintiff does not prevail." (*Id.* at pp. 466-467, quoting *Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 681-682; see also *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129; *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 897-899 [noting that the *International Billing* approach had been "repeatedly criticized and rejected"].)

Here, we find that defendants have failed to establish estoppel even under *International Billing*. Although BFCAP alleged that it had incurred attorney fees as part of its claim for breach of the PSA, it did not specifically allege a right to fees pursuant to section 16.1.1(c)(ii)[8] or otherwise assert that the litigation constituted a Buyer's Action as defined by that section. Thus, it is not estopped from challenging defendants' right to collect fees under that section now. Moreover, as the trial court found, BFCAP does not argue that the provision is not an enforceable attorney fee provision, as the plaintiff did in *International Billing*. Instead, BFCAP contends that the condition

---

[8]     As defendants have argued, the PSA contains more than one potentially applicable attorney fees provision.

16

precedent to trigger the application of the fee provision never occurred.  It is not estopped from making this claim.

C.  *Interpretation of the PSA*

We now turn to BFCAP's substantive claim of error—the trial court's finding that defendants were entitled to attorney fees pursuant to section 16.1.1(c)(ii) of the PSA.  There is no dispute that defendants successfully defended against BFCAP's action for breach of the PSA and were therefore the prevailing parties on that claim.  (See, e.g., *Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 ["when a defendant defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract . . . as a matter of law"].)  We also agree with BFCAP and the trial court that section 16.1.1(c)(ii) contained a condition precedent.[9]  Specifically, defendants were entitled to attorney fees under that provision if they prevailed on a Buyer's Action, defined as occurring if:  (1) BFCAP initiated litigation against defendants alleging breach of the PSA; *and* (2) in connection with that litigation, BFCAP attempted "to enjoin, attach or restrict [defendants'] ability to sell or transfer the Acquired Assets or any portion thereof."

BFCAP focuses on the court's finding that the second part of the condition occurred.  The court found that BFCAP initiated a Buyer's Action because it sought to attach "Defendants' assets" in 2018. BFCAP argues that the trial court erroneously equated defendants' assets with the Acquired Assets.  We agree.

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  (Civ. Code, § 1638.)  When interpreting a contract, courts "consider the "'clear and explicit" meaning of [the contract] provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a

---

[9]  Defendants assert that the "purported limitation of attorneys' fees in the definition of 'Buyer's Action' under the PSA does not bar a prevailing party's recovery of attorneys' fees generally under the PSA and MOTA."  This argument does not assist defendants here, as they did not rely on a "general" right to contractual attorney fees in their original motion, but cited only section 16.1.1(c)(ii).

17

special meaning is given to them by usage.""" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; see also Civ. Code, § 1644.)

Here, the PSA expressly defined a Buyer's Action to require an attempt by BFCAP to attach or otherwise restrict the Acquired Assets. In turn, the Acquired Assets are defined in the PSA as the facility lease and other assets that were to be transferred to BFCAP pursuant to the agreement. There is no dispute that the transaction was completed in 2016. Thus, the evidence suggests that the Acquired Assets were transferred to BFCAP at that time. More broadly, the plain meaning of section 16.1 does not apply here. By its terms, section 16.1 involves *pre-closing* defaults, while the issues in this litigation involved a post-closing dispute. Section 16.1.1 governs protections and remedies for the sellers (defendants) in the event that the buyer (BFCAP) defaulted on the transaction. Those protections include the provisions of section 16.1.1(c)(ii), which enables defendants to seek attorney fees incurred if, in the course of a default, BFCAP attempted to tie up the assets from the transaction. Defendants have not claimed that BFCAP defaulted on the transaction or otherwise shown how these provisions would apply to this litigation.

The trial court did not expressly address whether defendants' assets in 2018 (when BFCAP applied for an attachment) included any Acquired Assets as defined by the PSA. To the extent the trial court made such a factual finding, we conclude that it was not supported by substantial evidence. In fact, defendants point to *no* evidence that any Acquired Asset remained in defendants' possession as of 2018, or, conversely, that BFCAP's attempted attachment included Acquired Assets. The application for a writ of attachment, filed after BFCAP had owned the Acquired Assets for nearly a year and a half, simply referred to defendants' assets generally. Moreover, plaintiffs' lawsuit did not assert that plaintiffs had not taken possession of the Acquired Assets. Instead, it raised an issue of responsibility for payment of the QAFs. Notably, a duty to pay accrued QAFs was defined in the PSA as an Acquired *Liability*, not an Acquired *Asset*. Apart from citing to the trial court's finding that BFCAP attempted to attach "defendants' assets" in 2018, defendants have offered no evidence supporting their argument that those

assets included Acquired Assets.  We therefore conclude that the trial court lacked substantial evidence to find that the condition precedent required by section 16.1.1(c)(ii) of the PSA had occurred.  As such, defendants were not entitled to attorney fees pursuant to that provision.  (See *Lange v. Schilling* (2008) 163 Cal.App.4th 1412, 1417 [finding that the plaintiff's "failure to meet the condition precedent required by [the contract] precludes any award of fees"]; *Leamon v. Krajkiewcz* (2003) 107 Cal.App.4th 424, 427 [same].)[10]

## DISPOSITION

The order granting defendants' motion for attorney fees is reversed. BFCAP is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



MANELLA, P. J.



WILLHITE, J.

---

[10]    We need not reach BFCAP's additional arguments that the trial court erred by awarding attorney fees for the entire litigation and that BFCAP was improperly limited in its oral argument on the attorney fee motion.

19